UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LOWELL HOUSING AUTHORITY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 08-10784-JLT |
| | * | |
| PSC INTERNATIONAL, INC., | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM

March 9, 2010

TAURO, J.

I.  Introduction

This action arises out of an alleged written agreement, under which Defendant PSC International, Inc. ("PSC") was to provide utility cost-savings consulting services to Plaintiff, Lowell Housing Authority ("LHA"). Plaintiff's Complaint seeks a declaration from this court that the agreement is void and unenforceable against it as a matter of law. Presently at issue is Plaintiff's Motion for Summary Judgment [#14]. For the following reasons, Plaintiff's Motion for Summary Judgment [#14] is DENIED.

II. Background

In late August 2006, PSC's representative, Bryan P. Yagoobian, contacted LHA Executive Director, Gary Wallace, to discuss a potential relationship between the two entities, by which PSC would provide utility cost savings consulting services to LHA.[2] Wallace instructed

---

[2]Depo. of Bryan P. Yagoobian, 14:9-15:8 (April 16, 2009) [hereinafter "Yagoobian Depo."].

1

Yagoobian to meet with LHA procurement officer, Judith Beilin. Thereafter, Yagoobian scheduled a meeting with Beilin and informed Wallace of the date.[3] During the meeting, which Wallace did not attend, Beilin decided to involve William Duggan, LHA Deputy Director for Facilities and Management.[4] After this initial meeting, Duggan was the only representative of LHA with which PSC had direct contact.[5]

As Deputy Director, Duggan is responsible for management of all LHA facilities. He reports directly to the Executive Director and assumes responsibility for the general operations of LHA when the Executive Director is unavailable.[6] His duties include participation in selection of consultants, supervision of consultants, review and approval of all purchase requisitions for materials, supplies, and equipment, and review and analysis of financial information pertinent to maintenance operations.[7] Of particular note for current purposes is Duggan's responsibility for procurement of electrical and utility services for LHA.[8]

On September 27, 2006, Duggan signed a contract (the "Contract") with PSC, purportedly on behalf of LHA,[9] which retained PSC as an exclusive representative to obtain utility

---

[3] Id.

[4] Depo. of Judith Beilin, 8:22-8:23 (April 14, 2009) [hereinafter "Beilin Depo."].

[5] Depo. of William Duggan, 61:6-61:8 (April 14, 2009) [hereinafter "Duggan Depo."].

[6] Def.'s Mem. Opp. Pl.'s Mot. Summ. Judg., Ex. J, Position Description: Deputy Director of Facilities/Operations.

[7] Id.

[8] Beilin Depo., 24:17-25:11.

[9] Duggan Depo., 16:2-17:18; Def.'s Mem. Opp. Pl.'s Mot. Summ. Judg., Ex. A, Consulting Services Agreement.

cost savings for LHA.[10] By the terms of the Contract, PSC was to make recommendations to LHA as to utility cost savings measures.[11] PSC's fee for such services was to be calculated as a percentage of the cost savings LHA realized as a consequence of accepting PSC's recommendations.[12]

To facilitate performance of the Contract, Duggan also signed Letters of Agency and Data Request Forms, authorizing PSC to obtain information from LHA's vendors in connection with cost savings evaluations.[13] Duggan had the proper authority to sign such written consents on behalf of LHA.[14] And, though Duggan did not in fact have express authority to enter the Contract in issue on behalf LHA, he told Yagoobian that was authorized to do so.[15]

In reliance on the signed Contract and discussions with Duggan, PSC conducted an analysis and recommended to LHA that it engage Direct Energy as a utilities supplier.[16] PSC representatives, William Weitzke and James Coleman, explained the cost savings associated with this recommendation to Duggan in a meeting shortly thereafter.[17] But Duggan later informed PSC that, while LHA did plan to select Direct Energy as a utilities provider, it was making the

---

[10]Def.'s Mem. Opp. Pl.'s Mot. Summ. Judg., Ex. A, Consulting Services Agreement.

[11]Id.

[12]Id.

[13]Duggan Depo., 26:21-27:7.

[14]Id. at 28:22-29:2.

[15]Yagoobian Depo., 38:11-38:17.

[16]Duggan Depo., 51:5-51:6.

[17]Depo. of William J. Weitzke, 30:16-31:12 (April 16, 2009).

selection through Power Options, a Massachusetts energy purchasing consortium, rather than through PSC.[18] Duggan does not recall when LHA received a recommendation from PSC or how LHA used such a recommendation.[19]  Nor does Duggan recall when LHA consulted with Power Options or if Power Options recommended using Direct Energy.[20]

After providing the recommendation, PSC calculated its fee based on the cost savings and requested payment.[21]  LHA Executive Director, Gary Wallace, denies any knowledge of any PSC dealings before February 2007, when Weitzke contacted Wallace directly after he failed to convince Duggan to perform under the Contract.[22]  Duggan, however, claims to have informed Wallace of the Contract when Weitzke first threatened to bring suit against LHA if it did not perform.  Wallace repudiated the Contract in a meeting with Weitzke on February 15, 2007.[23]  In so doing, Wallace told Weitzke that Duggan did not have authority to sign contracts on behalf of LHA and that it was a violation of LHA's procurement policy to engage with a consultant who makes money on a percentage basis on cost savings.[24]

Thereafter, PSC initiated arbitration in Connecticut, pursuant to the arbitration clause

---

[18]Aff. of William J. Weitzke, ¶ 14.

[19]Duggan Depo., 51:9-51:24.

[20]Id. at 53:14-53:20, 64:6-64:8.

[21]Def.'s Mem. Opp. Pl.'s Mot. Summ. Judg., Ex. I, Estimated Energy Savings Analysis.

[22]Depo. of Gary Wallace, 8:4-8:24 (April 14, 2009).

[23]Id. at 13:3-15:1.

[24]Id. at 14:8-14:14.

4

contained in the Contract.[25] The arbitration has since been stayed by agreement of the parties, pending the outcome of this action in which Plaintiff seeks a declaration that the Contract is void and unenforceable against it, as a matter of law.

III. Discussion

Plaintiff presents three alternative arguments to support its contention that the Contract is void or unenforceable against it, as a matter of law: (1) the Contract violates Mass. Gen. Laws c. 30B, the Uniform Procurement Act ("UPA"); (2) the Contract violates regulations promulgated by the United States Department of Housing and Urban Development ("HUD") that prohibit contingent or percentage based fees; and (3) even if the Contract is not rendered void by the UPA or HUD regulations, Defendant cannot enforce the Contract against it because Duggan did not have authority to bind LHA to the Contract. For the reasons set forth below, this court disagrees.

    A.    Summary Judgment

Pursuant to Fed. Rule of Civ. Pro. 56(c), summary judgment shall only be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The function of a summary judgment motion is to pierce the formal allegations of the pleadings and to determine whether further exploration of the facts is necessary.[26] As such, the adverse party must "set forth specific facts showing that there is a genuine issue for trial."[27] The

---

[25] Pl.'s Mem. Mot. Summ. Judg., 1; Def.'s Mem. Opp. Pl.'s Mot. Summ. Judg., 1.

[26] Hahn v. Sargent, 523 F.2d 461, 464 (1st. Cir. 1975).

[27] Fed. R. Civ. P. 56(e).

court will draw all reasonable inferences created by such facts in favor of the non-moving party.[28] Because Defendant has set forth specific facts showing that there is a genuine issue for trial as to (1) whether Duggan had apparent or implied authority to bind LHA to the Contract and (2) whether Wallace ratified the Contract on behalf of LHA, notwithstanding any lack of authority, this court may not properly resolve the case on summary judgment.

1. <u>Application of the UPA to Housing Authorities</u>

The UPA, which is contained in Mass. Gen. Laws c. 30B, mandates that contracts entered by a "governmental body" for the procurement of supplies, services, or real property in excess of $25,000 be made public and put out for competitive bidding.[29] All contracts entered into by governmental bodies in violation of the UPA are void.[30] Plaintiff relies solely on <u>Norfolk Electric, Inc. v. Fall River Housing Authority</u>,[31] for the proposition that housing authorities, such as LHA, are subject to the UPA and that the Contract at issue is void as a matter of law because it was not put out for public bidding in accordance with the UPA. This court disagrees.

In <u>Norfolk Electric</u>, the Massachusetts Supreme Judicial Court held that housing authorities are required to follow *applicable* state or local laws on procurement.[32] The court went on to find the relevant contract invalid for failure to comply with the competitive bidding

---

[28] <u>Hoffman v. Applicators Sales and Service, Inc.</u>, 439 F.3d 9, 11 (1st Cir. 2006) (citing <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 50 (1st Cir. 2000)).

[29] <u>See</u> Mass. Gen. Laws c. 30B §§ 1, 5, 6.

[30] Mass. Gen. Laws c. 30B § 17.

[31] 417 Mass. 207 (1994).

[32] <u>Norfolk Electric</u>, 417 Mass. at 215.

requirements for the renovation of public developments, contained in Mass. Gen. Laws c. 149 § 44A.  Based on a complex analysis of the interplay between the relevant HUD regulations and state law, the court found that, for purposes of § 44A, a housing authority was a public agency within the meaning of the statute.[33]  Notably, the <u>Norfolk Electric</u> decision does not stand for the general proposition that housing authorities must comply with all Massachusetts public procurement laws.  Rather, it sets forth the rule that, where a state procurement law is otherwise applicable, the receipt of federal funds was insufficient to qualify a housing authority as a federal agent exempt from competitive bidding requirements.[34]

Plaintiff can point to no case suggesting that a housing authority constitutes a "governmental body" within the meaning of the UPA.  Thus, the question of whether the UPA in fact applies to housing authorities, such as LHA, turns on whether this court construes the term "governmental body" to include housing authorities for purposes of the UPA, using statutory interpretation principles provided by the Massachusetts Supreme Judicial Court.

The UPA defines a "governmental body" as "a city, town, district, regional school district, county, or agency, board, commission, authority, department or instrumentality of a city, town, district, regional school district or county."[35]  A basic tenet of statutory construction is that "where the plain language of a statute is clear, it governs."[36]  In other words, "a term employed in a statute should be afforded its customary meaning, taking into account the legislation's purpose

---

[33]<u>Id.</u> at 215-18.

[34]<u>Id.</u> at 217.

[35]Mass. Gen. Laws c. 30B § 2.

[36]<u>One Nat'l Bank v. Antonellis</u>, 80 F.3d 606, 615 (1st Cir. 1996).

and history."[37]

Though Plaintiff does not in fact make such an argument, this court understands that the plain language of the statute, i.e. the use of the words "authority...of a city," strongly suggests that the statute indeed applies to housing authorities. But, in diversity jurisdiction, the function of the federal courts "is not to formulate a tenet which we, as free agents, might think wise, but to ascertain, as best we can, the rule that the state's highest tribunal would likely follow."[38] With these principles in mind, this court finds that the Supreme Judicial Court's construction of the term "political subdivision" in Simmons v. Clerk-Magistrate of Boston Division of Housing Court Department injects complexity into the process of interpreting what otherwise might be seen as clear statutory language.

In Simmons, the court held that housing authorities are not "political subdivisions of the commonwealth" for purposes of Mass. Gen. Laws c. 185C § 19, notwithstanding the fact that Mass. Gen. Laws c. 121B §17 expressly included housing authorities within the definition of "political subdivision."

> While a housing authority may be considered a political subdivision for purposes of a particular statute like G. L. c. 121B, § 17, where it is specifically defined as such, a definition in one legislative enactment does not have universal application to all Massachusetts statutes. If that were the case, as correctly pointed out by the clerk-magistrate, the Legislature would not have deemed it necessary expressly to indicate in other statutes that a housing authority is encompassed within the term "political subdivision" for purposes of those other statutes.[39]

The object of statutory interpretation is "to ascertain the true intent of the Legislature

---

[37] Falmouth Ob-Gyn Assoc., Inc. v. Abisla, 417 Mass. 176, 179 (1994).

[38] Porter v. Nutter, 913 F.2d 37, 40-41 (1st Cir. 1990) (quoting Kathios v. General Motors Corp., 862 F.2d 944, 949 (1st Cir. 1988)).

[39] Id.

from the words used. [The court] will not add words to a specific statute that the Legislature did not put there, either by inadvertent omission or by design.  Moreover, where the Legislature has employed specific language in one portion of a statute, but not in another, the language will not be implied where it is absent."[40]

Similarly to the Plaintiff in Simmons, Plaintiff here asks this court to look to the definition of "governmental body" in other Massachusetts statutes, which expressly include housing authorities, and to draw the inference that such a definition has universal application to all Massachusetts statutes.  Simmons makes clear that this court may not draw such an inference.  By way of example, Mass. Gen. Laws c. 25A § 3 defines a governmental body as a "city, town, district, regional school district or county, or an agency or authority thereof, *including a housing authority*...."[41]  If the legislature intended the term "governmental body" to have universal application to housing authorities, the Legislature would not have deemed it necessary to expressly indicate in Mass. Gen. Laws c. 25A § 3 that a housing authority is encompassed within that term.

Moreover, the housing authority enabling statute, Mass. Gen. Laws c. 121B, does not indicate that the UPA applies to housing authorities.  This omission is informative as to the Legislature's intent because the enabling statute *does* make specific reference to the application of other state laws governing public bidding to housing authorities.[42]  A court is not at liberty to "add

---

[40]Simmons v. Clerk-Magistrate of Boston Division of Housing Court Department, 448 Mass. 57, 62 (2006) (internal quotations omitted).

[41]See Mass. Gen. Laws c. 25A § 3.

[42]See Mass. Gen. Laws c. 121B § 26(j) ("Award of construction, reconstruction, installation, demolition, maintenance, alteration, remodeling, or repair contracts shall be governed by the provisions of section thirty-nine M of chapter thirty....").

words to a specific statute that the Legislature did not put there, either by inadvertent omission or by design."[43] And by the same token, a court may not ignore words that the Legislature has expressly included in the statute. Accordingly, this court must conclude that by explicitly listing some public bidding statutes by which it intended housing authorities to be bound, the Legislature also intended its omission of others.

Admittedly, some ambiguity is interjected by the fact that the UPA does explicitly refer to housing authorities in the definition of "majority vote"[44] and in a provision pertaining to dispositions and acquisitions of real property.[45] That being said, this court is mindful of the rule that "where the Legislature has employed specific language in one paragraph, but not in another, the language should not be implied where it is not present."[46] Accordingly, the UPA's reference to housing authorities elsewhere in the statute cannot be relied on to compel the conclusion that the Legislature also intended to impliedly include housing authorities in the definition of "governmental body."

This court's conclusion that the legislature did not intend for the term "governmental body," as used in the UPA, to subsume housing authorities is further bolstered by the fact that the

---

[43]Simmons, 448 Mass. at 62 (citing General Elec. Co. V. Dep't of Envtl. Protection, 429 Mass. 798, 803 (1999); Dartt v. Browning-Ferris Indus., Inc. 427 Mass. 1, 8-9 (1998)).

[44]See Mass. Gen. Laws c. 30B § 2. The term majority vote is used in two other sections of the UPA. § 12(b) states that "unless authorized by majority vote, a procurement officer shall not award a contract for a term exceeding three years...." § 15(g) states that "a governmental body may be majority vote, unless otherwise prohibited by law, dispose of a tangible supply no longer useful...."

[45]See id. at § 16(h). Notably, the reference in this section is made for the specific purpose of stating that § 16 does *not* apply to the rental of residential property to qualified tenants by a housing authority.

[46]Beeler v. Downey, 387 Mass. 609, 616 (1982).

housing authority enabling statute considers a housing authority to be an independent body liable in contract or tort in the same manner as a private corporation.[47]

> The statutes establishing housing authorities make it plain that such an authority, although organized by and in each city and town in cooperation with the State, is nevertheless, when organized, a complete corporate entity in itself, distinct from the municipal corporation within whose territory it is set up, and exercising its powers in its own independent right. It is an instrumentality of the government, but it is also a corporation having the contracting powers of a corporation.... It's contracts are its own and are not those of the municipality.[48]

As discussed above, the UPA's definition of "governmental body" includes an "authority...or instrumentality...of a city." Though such language would seem on its face to encompass a housing authority, the principles set forth in the housing authority enabling statute militate against a finding that the Legislature in fact intended that outcome.

"The design of the Legislature in enacting [public procurement] provisions was to establish genuine and open competition after due public advertisement in the letting of contracts for city work, to prevent favoritism in awarding such contracts and to secure honest methods of letting contracts in the public interests."[49] But importantly, the Legislature has also made clear that the contracts of a housing authority are "its own and not those of the municipality."[50] And when a potential conflict exists between statutory provisions, a court is obliged to interpret the statutory provisions "in a way that is harmonious and consistent with the legislative design."[51]

---

[47]See Mass. Gen. Laws c. 121B §§ 8, 13.

[48]Johnson-Foster Co. v. D'Amore Constr. Co., 314 Mass. 416, 419 (1943).

[49]Morse v. Boston, 253 Mass. 247, 252 (1925).

[50]Johnson-Foster Co., 314 Mass. at 419; see also Mass. Gen. Laws c. 121B §§ 8, 13.

[51]TBI, Inc. v. Board of Health of North Andover, 431 Mass. 9, 15 (2000).

With this principle in mind, this court cannot reasonably conclude that the legislature simultaneously intended for the law to treat housing authorities as governmental bodies when they enter contracts, but as private corporations when they are made to answer for those contracts.

This court, therefore, finds that the provisions of the UPA governing competitive bidding procedures for contracts for the procurement of services[52] do not apply to contracts entered into by a housing authority. And the Contract between PSC and LHA is not rendered void as a matter of law for failure to comply with the public bidding requirements of the UPA.

### 2. Application of HUD Regulations to the Contract

Plaintiff contends that the Contract provides for an illegal percentage-based or contingent fee in violation of HUD regulations. HUD's prohibition on contingent fees is embodied in 48 C.F.R. 2403.405, which incorporates the Covenant Against Contingent Fees contained in 48 C.F.R. 52.203-5. Both regulations prohibit enforcement of contracts entered into by a government agency with a party who has employed or retained a third-party to secure the government contract, in exchange for a fee that is contingent upon the third-party's success in securing the government contract. The Contract between LHA and PSC is not such a contract.

The percentage-based fee at issue here is not to be paid to PSC by a third-party wishing to secure a contract with the government. Rather, the fee is to be paid to PSC by the government agency itself, LHA, as a percentage of the cost savings realized due to acceptance of PSC's recommendation with regard to a utilities provider. If instead the agreement were one that called for a utilities provider to pay PSC a fee, which was contingent on PSC securing a contract between the utilities provider and LHA, the agreement would be void under the relevant HUD

---

[52] See Mass. Gen. Laws c. 30B §§ 1, 5, 6.

regulations. That is not, however, the situation presented here.

To the contrary, the Contract at issue in this case appears to be expressly authorized by 24 C.F.R. 990.185, which provides financial incentives to public housing authorities to enter into energy performance contracts, in order to reduce energy rates or consumption. Energy performance contracts qualify for these incentives if, as contemplated by the Contract between LHA and PSC, payments under the contract are to be funded from reasonably anticipated energy cost savings. Qualifying energy conservation measures include, among other things, shared savings agreements between a public housing authority, such as LHA, and a private energy service company, such as PSC.

Accordingly, this court finds that the Contract at issue does not violate HUD regulations and Plaintiff is not entitled to judgment as a matter of law on that basis.

### 3. <u>Assertion of Implied Authority, Apparent Authority, and Ratification against a Housing Authority</u>

Lastly, Plaintiff argues that the Contract is unenforceable against it because Duggan did not have express authority to bind LHA. In support of this argument, Plaintiff states that Gary Wallace, the Executive Director, is the only person authorized to contract on behalf of LHA and that Wallace neither executed nor authorized Duggan to execute the Contract with PSC. Plaintiff further contends that Massachusetts law bars assertion of the theories of implied authority, apparent authority, and ratification by a party seeking to enforce a contract against a housing authority. This court disagrees.

Plaintiff correctly sets forth the usual rule that "one dealing with the officers or agents of a municipal corporation must, at his peril, see to it that those officers or agents are acting within the

13

scope of their authority."[53]  As such, "persons who deal with a government agency must take notice of limitations upon that agency's contracting power and cannot recover upon a contract which oversteps those limitations."[54]

Because housing authorities have been likened to municipal corporations in some respects, it is true that "the existence of apparent authority in agents of such public bodies...is not readily assumed."[55]  Nonetheless, a housing authority is "a public body politic and corporate" and "it is liable in contract or in tort in the same manner as a private corporation."[56]  "Although in certain respects a public body, [a housing authority] in carrying on its housing functions is submissible to and must abide by the ordinary substantive law of the Commonwealth the rules of contract, tort, and so forth."[57]

In keeping with this principle, Massachusetts courts have permitted the presentation of evidence to demonstrate that an agent of a housing authority had implied or apparent authority to enter a contract on the housing authority's behalf and have at times found such implied or apparent authority to exist.[58]  The Supreme Judicial Court has also contemplated the use of the

---

[53]Sancta Maria Hosp. v. Cambridge, 369 Mass. 586, 595, 341 N.E.2d 674 (1976).

[54]White Constr. Co. v. Commonwealth, 11 Mass. App. Ct. 640, 648 (1981).

[55]Savignano v. Gloucester Housing Authority, 344 Mass. 668, 671 (1962) (internal citations omitted).

[56]Ryan v. Boston Housing Authority, 322 Mass. 299, 300 (1948) (internal citations omitted); see also, Mass. Gen. Laws c. 121B §§ 8, 13.

[57]Perez v. Boston Housing Authority, 379 Mass. 703, 727-28 (1980) (internal citations omitted).

[58]See, e.g., Costonis v. Medford Housing Authority, 343 Mass. 108 (1961) (finding that the executive director of the Medford Housing Authority had implied and apparent authority to orally agree to modifications to a contract, notwithstanding a contract provision requiring all

theory of ratification of an agent's unauthorized contract against a defendant housing authority.[59] Accordingly, Plaintiff has failed to demonstrate that PSC is barred from asserting the doctrines of apparent authority, implied authority or ratification against LHA as a matter of law.

Moreover, PSC has presented evidence establishing that genuine issues of material fact exist as to (1) whether Duggan had apparent or implied authority to bind LHA to the Contract with PSC and (2) whether Wallace's conduct served to ratify the contract, notwithstanding any lack of authority on Duggan's part.

        i.      Apparent Authority

"Apparent authority is that authority resulting 'from conduct by the principal which causes a third person reasonably to believe that a particular person...has authority to enter into negotiations or to make representations to his agent.'"[60] The question of whether an agent has apparent authority to enter a Contract on a principal's behalf is to be answered by drawing inferences from "a variety of circumstances relating to the conduct of the apparent agent, and whether the circumstances are such as to warrant persons of reasonable prudence and discretion, to believe [the agent] has authority to represent the alleged principal in regard to the transaction in

---

changes to be made pursuant to a written order of the Authority); Simonelli v. Boston Housing Authority, 334 Mass. 438 (1956) (affirming judgment for housing authority where evidence was insufficient either to establish express or implied authority of agents to bind housing authority or to establish ratification of the agreement by the principal); Savignano v. Gloucester Housing Authority, 344 Mass. 668 (1962) (affirming auditor's determination that facts did not support finding that agent had apparent authority to waive contract provision requiring written order of housing authority for extra work).

[59]See Simonelli, 334 Mass. at 441.

[60]Binkley Co. v. Eastern Tank, Inc., 831 F.2d 333, 337 (1st Cir. 1987) (quoting Hudson v. Mass. Property Ins. Underwriting Ass'n, 386 Mass. 450, 457 (1982).

question."[61] When an individual is in charge of particular transaction, he is thought to have broad apparent authority to bind his principal to that transaction.[62]

Here, Defendant has presented sufficient facts warranting a reasonable person to believe that Duggan had authority to bind LHA to the Contract to prevent this court from deciding the issue on summary judgment. Duggan's job title and broad array of duties as Deputy Director, particularly his responsibility for procurement of utilities, strongly suggest that he would have the authority to enter a contract, the focus of which was utilities cost-savings. This is especially true when viewed in light of the fact that Defendant first contacted LHA's Executive Director regarding a potential relationship between LHA and PSC. Wallace instructed Defendant to discuss the transaction with Beilin, an LHA procurement officer, who subsequently told Defendant that Duggan was the proper person to deal with. Notably, neither Wallace, nor Beilin, nor Duggan himself ever indicated to Defendant that Duggan may lack authority to bind LHA to any agreement that may result from those discussions. Accordingly, this court finds that a question of material fact exists as to whether Defendant was reasonable in believing that Duggan had authority to bind LHA to the Contract.

## ii. Implied Authority

Implied authority is "actual authority that evolves by implication from the relationship of the principal and the agent."[63] An agent has implied authority to do those acts that are reasonably

---

[61] Lord v. Lowell Institution for Savings, 304 Mass. 212, 214 (1939).

[62] Costonis, 343 Mass. At 114-15.

[63] Theo & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 744 (2000).

necessary to accomplish the transaction for which the agent has actual authority.[64]  Implied authority may also arise from a principal's course of conduct that demonstrates acquiescence in similar acts by the agent.[65]  The distinction between implied and apparent authority lies in the person interpreting the principal's words or conduct.  With regard to apparent authority, it is the reasonable belief of a third person that establishes the agent's authority to bind the principal, whereas with implied authority it is the reasonable belief of the agent himself that establishes authority.[66]

      Defendant has presented sufficient evidence to prevent this court from disposing of the issue of implied authority on summary judgment.  Wallace knew that PSC was in discussions with his subordinates at LHA as of August 2006, since PSC contacted him to propose a potential relationship between the two entities and he directed them to deal with Beilin, who in turn directed them to deal with Duggan.  Duggan had a broad range of responsibilities as the Deputy Director, including assuming the responsibility of all of LHA's general operations when the Executive Director was unavailable.  And, though Wallace knew that PSC sought to enter a utilities cost-savings contract with LHA, he nonetheless directed PSC and his subordinates to deal directly with each other in conducting the negotiations.  Though these facts do not unequivocally demonstrate that Duggan was reasonable in believing he had authority to enter the Contract at issue as an action incidental or necessary to his authorized duties, they are sufficient to raise a question of material fact as to the existence of implied authority, which is not within this court's

---

[64]MacDonald v. Gough, 326 Mass. 93, 97 (1950).

[65]Stoneman v. Fox Film Corp., 295 Mass. 419, 426 (1936).

[66]Colony of Wellfleet, Inc. v. Harris, 14 LCR 223, 225 (Mass. Land Ct. 2006).  See Restatment (Second) of Agency, §§ 8 cmt. a, 27 cmt. a.

power to answer on summary judgment.

### iii. Ratification

Finally, under the doctrine of ratification, when "an agent lacks actual authority to agree on behalf of his principal, the principal may still be bound if the principal acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts."[67] And, as with the issues of apparent and implied authority, Defendant has presented sufficient evidence to prevent this court from deciding whether LHA's Executive Director Wallace ratified the Contract with PSC, notwithstanding any lack of authority on Duggan's part to enter it in the first place.

Wallace had early knowledge of the dealings with PSC, as he was the first representative of LHA to which PSC proposed the idea of a utilities cost-savings agreement. Wallace had the means to obtain all information concerning the Contract, since Duggan reported directly to him. And Duggan claims to have told Wallace of the Contract when Weitzke first informed Duggan that PSC intended to sue LHA if it did not perform, but Wallace did not repudiate the contract until Weitzke came to meet with Wallace himself on February 15, 2007. Drawing all reasonable inferences in favor of Defendant, the non-moving party, this court finds that the facts presented raise sufficient questions as to whether Wallace either acquiesced in the execution of the Contract or failed to repudiate the Contract in a reasonably prompt manner to prevent this court from resolving the issue of ratification on summary judgment.

## IV. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [#14] is DENIED.

---

[67] Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 18 (1997).

AN ORDER HAS ISSUED.

/s/ Joseph L. Tauro
United States District Judge